IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **SemCrude, L.P.,** *et al.,* | Case No. 08-11525 (BLS) |
| Reorganized Debtors. | (Jointly Administered) |
| **J. Aron & Company,** | Adv. No. 09-50038 |
| Plaintiff, | Related to Adv. Docket Nos. 659, 660, 701, 704, 710, 711, 716, & 737 |
| v. | |
| **SemCrude, L.P.,** *et al.,* | |
| Defendants. | |
| **BP Oil Supply Company,** *et al.,* | Adv. No. 09-50105 |
| Plaintiffs, | Related to Adv. Docket Nos. 702, 721, 733, 734, 735, 738, 741, 748, 750, 751, 772, & 774 |
| v. | |
| **SemCrude, L.P.,** *et al.,* | |
| Defendants. | |
| **Anstine & Musgrove, Inc.,** *et al.,* | Adv. No. 10-51797 |
| | Related to Adv. Docket |

| | |
|---|---|
| Plaintiffs, | Nos. 425, 426, 427, 444, 447, 448, 449, 450, 453, 454, 459, 460, 464, 472, & 491 |
| v. | |
| **J. Aron & Company,** *et al.,* | |
| Defendants. | |

| | |
|---|---|
| **Arrow Oil & Gas, Inc.,** *et al.,* | Adv. No. 10-51825 |
| Plaintiffs, | Related to Adv. Docket Nos. 430, 431, 432, 471, 474, 475, 4776, 477, 480, 487, 491, 499, & 518 |
| v. | |
| **J. Aron & Company,** *et al.,* | |
| Defendants. | |

| | |
|---|---|
| **IC-CO, Inc.,** *et al.,* | Adv. No. 11-51773 |
| Plaintiffs, | Related to Adv. Docket Nos. 126, 127, 140, 143, & 158 |
| v. | |
| **J. Aron & Company,** | |
| Defendant. | |

| | |
|---|---|
| **Orange Creek Energy LPV, LP,** | Adv. No. 11-53148 |
| | Related to Adv. Docket |

Plaintiff,

v.

J. Aron & Company, *et al.*,

Defendants.

Nos. 66, 67, 68, 76, 79, 80, & 96

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 28 U.S.C. § 157(c)(1) AND FED. R. BANKR. P. 9033(a)

In these adversary proceedings, the Court has before it a collection of motions for summary judgment (the "Motions") filed by the Downstream Purchasers.[1] The sequence of relevant events is not in dispute: before the Petition Date, the Producers sold oil and gas to the Debtors, and the Debtors promptly sold that oil and gas to third parties, including the Downstream Purchasers. By these Motions, the Downstream Purchasers are seeking a ruling from this Court that they purchased that oil and gas from the Debtors free and clear of any liens or other rights of the Producers who originally sold such product to the Debtors. As set forth in detail below, the Court finds that the Downstream Purchasers are "buyers for value" within the meaning of U.C.C. § 9-317 and are thus insulated from the claims of the Producers. Further, the Court also finds that the Downstream Purchasers are buyers in the ordinary course under U.C.C. § 9-320, providing a separate, complete defense to the Producers' claims. The Court will therefore recommend that the Downstream Purchasers' Motions be granted.

## I. BACKGROUND

On July 22, 2008 (the "Petition Date"), SemGroup, L.P. and certain direct and indirect subsidiaries (collectively, the "Debtors")[2]

---

[1] Capitalized terms used in this introduction are defined *infra*.

[2] The Debtors in this case are SemCrude, L.P. (hereinafter, "SemCrude"), Chemical Petroleum Exchange, Incorporated, Eaglwing, L.P. (hereinafter, "Eaglwing"), Grayson Pipeline, L.L.C., Greyhawk Gas Storage Company, L.L.C., K.C. Asphalt L.L.C., SemCanada II, L.P., SemCanada L.P., SemCrude Pipeline, L.L.C., SemFuel Transport LLC, SemFuel, L.P., SemGas Gathering LLC, SemGas Storage, L.L.C., SemGas, L.P. (hereinafter, "SemGas"),

each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). By Order dated October 28, 2009 (the "Confirmation Order"),[3] the Court confirmed the Debtors' Fourth Amended Joint Plan of Affiliated Debtors (the "Plan").[4] The Plan and the Confirmation Order expressly preserved certain claims and causes of action and provided for this Court's retention of jurisdiction over those claims, including the claims currently before the Court in these adversary proceedings.[5]

As of the Petition Date, the Debtors were engaged in a number of different business segments in the energy industry. The Debtors' primary business was providing midstream oil and gas services, moving petroleum products and natural gas via trucks and a network of pipelines, and storing these products in Oklahoma and elsewhere. The Debtors' consolidated revenues for the fiscal year of 2007 totaled approximately $13.2 billion.

In addition to their physical purchasing and selling of petroleum products and natural gas, the Debtors had a substantial marketing business, which consisted of purchasing and reselling physical product, and other producer services. As part of this marketing business, the Debtors also traded in derivatives on both the New York Mercantile Exchange ("NYMEX") and the over-the-counter ("OTC") markets.

In the weeks leading up to the Petition Date, the Debtors' business experienced a series of setbacks, including massive trading losses and increased margin requirements on futures contracts driven by volatility in the energy commodities markets.[6] As a result of a liquidity crisis brought on by the trading losses and margin calls, the

---

SemGroup Asia, L.L.C., SemGroup Finance Corp., SemGroup, L.P., SemKan, L.L.C., SemManagement, L.L.C., SemMaterials Vietnam, L.L.C., SemMaterials, L.P., SemOperating G.P., L.L.C., SemStream, L.P., SemTrucking, L.P. and Steuben Development Company, L.L.C.

[3] Docket No. 6347.

[4] Docket No. 6329.

[5] See Confirmation Order ¶¶ 65-67.

[6] The events giving rise to the bankruptcy proceedings, and particularly the losses incurred in connection with the Debtors' pre-petition trading activities, were the subject of an extensive investigation by a Court-appointed examiner. See Final Report of Louis J. Freeh, Bankruptcy Court Examiner, dated April 15, 2009 [Docket No. 3701]. This Opinion does not discuss these events, or the facts discussed in Mr. Freeh's report, except to the extent relevant to the adjudication of the Motions.

Debtors were forced to seek Chapter 11 bankruptcy protection in the summer of 2008.

## A. Oil and Gas Industry

Before further discussion of the complex history of the instant litigation, the Court will summarize the relevant factual background on the oil and gas industries developed in earlier litigation in this bankruptcy case.[7]  The record reflects that the Debtors purchased oil and gas from producers in at least eight states.[8]  As a general matter, crude oil extracted from the ground is routed into a storage tank for ground transportation or to a gathering line into a pipeline; natural gas is always directed through gathering lines into a pipeline.  Title to the oil and gas may be transferred at some point within the spacing unit, at a market center or hub, or at any place in between.  Unit operators typically sell product to purchasers on behalf of various interest and royalty owners.  Division orders executed by all interested parties set forth the distribution of product sale proceeds.  By industry custom, purchasers pay for oil on the 20th day of the month following delivery of oil and on the 25th day of the month following delivery of gas.[9]

## B. The Debtors' Business with the Producers and the Downstream Purchasers

Debtors SemCrude and Eaglwing contracted with certain producers in at least eight states to purchase oil and gas.  These producers — working interest owners or operators — regularly delivered substantial volumes of oil and natural gas to the Debtors pursuant to written or oral agreements between the parties.

As of the Petition Date, over one thousand producers had not been paid for oil and gas product delivered between June 1, 2008 and July 21, 2008.  The total production that the Debtors purchased, but did not pay for, was valued in excess of four hundred million dollars.[10]

---

[7] *See Mull Drilling Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 82, 88-93 (Bankr. D. Del. 2009); *Arrow Oil & Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 112, 118-23 (Bankr. D. Del. 2009); *Samson Res. Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 140, 143-48 (Bankr. D. Del. 2009).

[8] The eight states are Kansas, Texas, Oklahoma, New Mexico, Missouri, Colorado, North Dakota, and Wyoming.

[9] *See, e.g.*, Conoco General Provisions [for] Domestic Crude Oil Agreements (the "Conoco General Provisions"), Producers Omnibus Resp. Ex. 1 ¶ F [Adv. No. 09-50038, Docket No. 701].

[10] *See generally* Schedules & Statements of Fin. Affairs for SemCrude, L.P. [Docket No. 1805].

As noted above, the Debtors operated a midstream oil company. They owned neither wells nor refineries, but moved and stored petroleum products. The record reflects that after receiving oil and gas from the various producers, the Debtors sold or transferred that oil and gas to various purchasers.[11]

## C. The Producer Adversaries

The Debtors' Chapter 11 filing generated a wave of litigation between and among certain oil and gas producers (collectively, the "Producers"),[12] the Debtors, certain purchasers of oil and gas product

---

[11] Whether the Downstream Purchasers actually received the Producers' oil and gas is a hotly contested issue. The Court has carefully considered the parties' submissions relating to the tracing issue. *See generally* Monger Aff. [Adv. No. 09-50038, Docket No. 658]; Tittle Aff. [Adv. No. 09-50038, Docket No. 703]. Given the Court's disposition of the matter as described *infra*, the Producers' ability or inability to trace the oil and gas is not dispositive of the issues before the Court.

[12] The record reflects that the Producers originally engaged in this litigation are: Anstine & Musgrove, Inc.; Arrow Oil & Gas, Inc.; Beasley Oil Company; Blake Exploration, LLC; Braden-Deem, Inc.; Calvin Noah, d/b/a Calvin Noah Oil Company; CMX, Inc.; Casey Musgrove Oil Co., Inc.; Central Operating, Inc.; Chaparral Energy, LLC; Clark Exploration Company; Coral Coast Petroleum, Inc.; Crawley Petroleum Corp.; DC Energy, Inc.; D.E. Exploration, Inc.; Davis Petroleum, Inc.; Daystar Petroleum, Inc.; DK Operating, Inc.; Double Eagle Exploration, Inc.; Drillers and Producers, Inc.; Duncan Oil Properties, Inc.; Durme Equities, Inc.; Fairfield Oil & Gas Corp.; The Gloco, LLC; GMX Resources, Inc.; GRA EX, LLC; Great Plains Energy, Inc.; Ground Development Co.; Herman L. Loeb, LLC; H.I. Inc.; Hutchinson Oil Company; J & D Investments, LLC; Jack Exploration, Inc.; Kahan & Associates, Inc.; Keith F. Walker Oil & Gas Co., LLC; Kingery Drilling Co.; KLM Exploration Company, Inc.; Lance Ruffel Oil & Gas Corporation; Landmark Resources, Inc.; Lario Oil & Gas Company; L & J Oil Properties, Inc.; LD Drilling, Inc.; Little Bear Resources, Inc.; McCoy Petroleum Corporation; McGiness Oil Company of Kansas; Mesa Exploration Company, Inc.; Mid-Continent Energy Corporation; Molitor Oil, Inc.; Mull Drilling Company, Inc.; Murfin Drilling Company, Inc.; Musgrove Energy, Inc.; Mustang Fuel Corp.; NYTEX Energy, LLC; Oil Company of America, Inc.; Oklahoma Oil & Gas Management, Inc.; Osborn Heirs Company, Ltd.; Pickrell Drilling Company, Inc.; Prolific Resources, LLC; RAMA Operating Company, Inc.; Randon Production Company, Inc.; Red Oak Energy, Inc.; Ritchie Exploration, Inc.; RJ Sperry Co.; Ross Hoener, Inc.; Seeker, LLC; Short & Short, LLC; Snyder Partners; Stephens & Johnson Operating Co.; Tempest Energy Resources, LP; Tex-Ok Energy Limited Partnership; TGT Petroleum Corporation; Three-D Resources, Inc.;

from the Debtors (collectively, the "Downstream Purchasers"),[13] and the Debtors' secured lenders (collectively, the "Banks").[14] Within a few weeks following the Petition Date, the Producers filed numerous complaints commencing adversary proceedings relating to reclamation demands and alleged liens on oil and gas (and the proceeds thereof) sold to the Debtors.[15] In a nutshell, the Producers moved promptly in this Court to take back oil and gas (or related sale proceeds) that they had delivered to the Debtors on or after June 1, 2008 through the Petition Date, and for which such Producers had not been paid. The Producers either sought stay relief to pursue their asserted state law liens and trust rights (described in detail below), or to reclaim their delivered product under state laws governing reclamation. The Banks, as the Debtors' first priority senior secured lenders, vigorously opposed the relief sought by the Producers claiming that the oil and gas (and the proceeds thereof) constituted the Banks' collateral.

Faced with a tidal wave of disparate adversary proceedings and motion practice, the Debtors requested authorization to establish omnibus procedures for a determination of the Producers' rights and priorities pursuant to §§ 105(a) and 362 of the Bankruptcy Code and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.[16] On September 17, 2008, the Court entered an Order (the "Procedures Order")[17] adopting a proposed structure negotiated and supported by

---

Thoroughbred Associates, LLC; Tripledee Drilling Co., LLC; Tripower Resources, LLC; Viking Resources, Inc.; V.J.I. Natural Resources, Inc.; Veenker Resources, Inc.; Vess Oil Corporation; Vincent Oil Corporation; W.D. Short Oil Company, LLC; Wellco Energy, Inc.; Wellstar Corporation; White Exploration, Inc.; White Pine Petroleum Corporation; New Dominion, LLC; Hope Partners, Inc.; Timmy Joe Degge d/b/a Degge Oilfield Service; IC-CO Inc.; W.E.O.C. Inc.; Reserve Management, Inc.; Luke Oil Company; C&S Oil/Cross Properties, Inc.; Wayne Thomas Oil and Gas; William R. Earnhardt Co.; Titan Energy, Inc.; Winstar Energy I, L.P.; and Loren Gas, Inc. The record further reflects that certain of these parties may have reached full or partial settlements with Downstream Purchasers.

[13] For purposes of the Motions before the Court, the Downstream Purchasers are J. Aron & Co. ("J. Aron") and B.P. Oil Supply Co. ("BP").

[14] Bank of America, N.A., the administrative agent for the Debtors' pre-petition lenders, represented the Banks in these proceedings.

[15] *See Mull Drilling Co. v. SemCrude, L.P.*, 407 B.R. 82, 92-93 (Bankr. D. Del. 2009).

[16] Docket No. 600.

[17] Docket No. 1425.

the Producers, the Debtors, and the Banks. In further hopes of efficiently administering these proceedings, the Court appointed a Producers' Committee by Order dated October 15, 2008.[18] The Producers' Committee was not a named party to the litigation commenced under the Procedures Order. Pursuant to the Procedures Order, the Producers filed one adversary proceeding with respect to each of the eight states in which the Producers sold product to the Debtors.[19]

The purpose of these eight lawsuits was to obtain a declaratory judgment establishing (i) the state law lien and trust rights, if any, afforded to the Producers who sold product to the Debtors; and (ii) the priority of these Producers' rights relative to the Banks' asserted perfected security interests in the Debtors' existing and after-acquired inventory.[20] These multiple adversary proceedings were intended to constitute "the sole procedure, means, and mechanism by and through which the Court will determine the Threshold Questions of Law that will govern the rights of all Producers, Debtors, their creditors, and all other parties in interest" with respect to the Producers' asserted state law interests in oil and gas product and the proceeds thereof.[21]

By Order dated February 26, 2009, the Court granted the motions of certain Downstream Purchasers to intervene in the Producer Adversaries (the "Intervention Order").[22] The Downstream Purchasers sought declaratory relief that the oil and gas they purchased from the Debtors during the relevant period was free and clear of any liens or encumbrances, including the Producers' asserted interests under state law, pursuant to the Downstream Purchasers' respective contracts with the Debtors, industry custom, and applicable state and federal law.[23] The Intervention Order provided that the issues raised by the Downstream Purchasers would be held in abeyance pending a decision on the relative priority of the Banks and the Producers.[24] The Producers and the Banks thereafter filed cross-motions for summary

---

[18] Docket No. 1774.

[19] Procedures Order 2-3.

[20] See Mull Drilling Co., 407 B.R. at 93.

[21] Procedures Order 3.

[22] Adv. No. 08-51445, Docket No. 116.

[23] See, e.g., J. Aron's Mot. to Intervene [Adv. No. 08-51445, Docket No. 42].

[24] Intervention Order 4.

judgment on complaints seeking declaratory relief in the Producer Adversaries in Kansas, Texas, and Oklahoma.[25]

On June 19, 2009, after several days of argument on the motions for summary judgment, the Court issued three separate opinions and orders in the Producer Adversaries (the "June 2009 Opinions"). For purposes of these opinions, the Court and the parties presumed the extent, validity, and priority of the Banks' security interests and reserved for later adjudication the issue of the calculation and amount of the Producers' claims in the respective state adversaries. *See, e.g., Mull Drilling Co.*, 407 B.R. at 93. The Court held that the Banks' duly perfected security interests in the Debtors' property were superior to the lien claims and trust rights purportedly granted under the state laws of Kansas, Texas, and Oklahoma. *See id.* at 110; *Arrow Oil & Gas, Inc. v. SemCrude, L.P.*, 407 B.R. 112, 138-39 (Bankr. D. Del. 2009); *Samson Res. Co. v. SemCrude, L.P.*, 407 B.R. 140, 156-57 (Bankr. D. Del. 2009). The Court found that the state statutes provided, at best, unperfected security interests because the Producers in each state failed to perfect their security interests under the appropriate state law governing perfection of their security interests. *Id.*[26]

Recognizing that the June 2009 Opinions each addressed questions of first impression, this Court certified the rulings *sua sponte* for direct appeal to the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 158(d)(2). *See, e.g., Mull Drilling Co.*, 407 B.R. at 110-11. Prior to the scheduled date for oral argument before the Third Circuit, the Debtors, the Banks, and certain Producers reached a settlement. In light of these developments, by Order dated December 6, 2010, the Third Circuit vacated the Order authorizing the direct

---

[25] As noted, adversary proceeding complaints were filed with respect to each of the eight states in which the Debtors purchased oil and gas prior to the Petition Date. By agreement of the parties, the claims and defenses raised in connection with the laws of Kansas, Texas, and Oklahoma were presented first to the Court. Upon the filing of stipulations of dismissal in the five proceedings regarding the laws of New Mexico, Missouri, Colorado, North Dakota, and Wyoming, the Court dismissed certain claims without reaching the substantive merits of the threshold issues raised in those proceedings.

[26] In *Samson Resources*, the Court held that the Oklahoma PRSA, defined *infra* Part IV.G., relied upon by the Oklahoma Producers did not impose a trust for their benefit over oil and gas production and the proceeds thereof. 407 B.R. at 156. Further, the Court held that any lien interests provided to the Oklahoma Producers by the Oklahoma lien laws were subordinate to the Banks' prior perfected security interests. *Id.* at 157.

appeal.[27]  The Downstream Purchasers, however, were not parties to this settlement, and the Producers reserved their right to continue to pursue the Downstream Purchasers to recover oil and gas (or proceeds thereof) that they had delivered to the Debtors prior to the Petition Date.

## D. The Tender Adversaries

During the pendency of the motions for summary judgment in the Producer Adversaries, the Downstream Purchasers filed motions and commenced separate adversary proceedings (the "Tender Adversaries") seeking the Court's permission to tender net settlements under their respective "umbrella" agreements[28] with the Debtors, in full and complete satisfaction of their obligations to any party for the oil and gas product (and the proceeds thereof) received from the Debtors.[29] The Downstream Purchasers argued that this relief was warranted because they took the oil and gas product free and clear of the Producers' interests (if any) pursuant to their contracts with the Debtors.

The Producers objected to the relief sought in the Tender Adversaries. While they were supportive of the payment of millions of dollars of net obligations by the Downstream Purchasers, the Producers opposed any order or ruling that would have released or insulated the Downstream Purchasers from ongoing claims by the Producers.[30]

The Court issued an Order in the J. Aron adversary proceeding on June 2, 2009, and subsequently in the other Tender Adversaries, granting relief from the automatic stay to allow the Downstream

---

[27] Docket No. 8610.

[28] As discussed in greater detail below, the Downstream Purchasers entered into master agreements with the Debtors governing, *inter alia*, the calculation and payment of net settlement amounts upon default by one of the parties. *See* Zutshi Decl. Ex. E (J. Aron's ISDA Master Agreement) [Adv. No. 09-50038, Docket No. 664]; Lullo Decl. Exs. A-C (BP's Master Net Settlement Agreement, ISDA Master Agreement, and EEI Master Netting, Setoff, Security and Collateral Agreement (the "EEI Agreement")) [Adv. No. 09-50105, Docket No. 329].

[29] *See, e.g.,* J. Aron Compl. [Adv. No. 09-50038, Docket No. 1]; BP Compl. [Adv. No. 09-50105, Docket No. 1].   The proposed tender amounts were approximately $90 million and $10.6 million from J. Aron and BP, respectively.

[30] *See* Samson Mot. for Partial Dismissal ¶¶ 42-45 [Adv. No. 09-50038, Docket No. 6].

Purchasers to turn over the tendered funds, to be held in escrow under the Court's jurisdiction pending further order from the Court.[31] In all, approximately $122 million was deposited into the Debtors' estates from the Downstream Purchasers. The Orders expressly preserved the parties' rights and claims with respect to the tendered funds.

On September 15, 2009, the Debtors filed a Motion in Aid of Confirmation requesting the release of the tendered funds in accordance with the Plan.[32] The Debtors' Plan memorialized the Producers' settlement agreements,[33] and the Court's Confirmation Order incorporated these agreements and approved the release of the tendered funds from escrow to fund Plan distributions.[34] The Confirmation Order required that the tendered funds be turned over to the Producers, in payment of the oil and gas product delivered from the Producers to the Debtors between July 2 and July 21, 2008.[35] The Confirmation Order also preserved the Producers' claims against the Downstream Purchasers for the unpaid portion of the Producers' claims and required the Debtors to cooperate in discovery.[36] The Court retained jurisdiction over the Tender Adversaries.

Following Plan confirmation, the Producers moved this Court to dismiss the Tender Adversaries, or in the alternative, to abstain from ruling in favor of having the disputes addressed in litigation commenced by the Producers in state court in Oklahoma, Texas, Kansas, and New Mexico.[37] The Court denied the Producers' requests, concluding that it possesses subject matter jurisdiction to hear and

---

[31] *See* Order for Payment of Funds to Debtors [Adv. No. 09-50038, Docket No. 77; Adv. No. 09-50105, Docket No. 59].

[32] Docket No. 5656.

[33] Docket No. 6329.

[34] *See* Confirmation Order ¶¶ 65-67 [Docket No. 6347].

[35] *See* Plan §§ 2.1, 3.1 (providing for distributions to the Producers on account of claims for oil and gas product delivered to the Debtors within twenty days of the Petition Date; product delivered in this 20-day window was deemed entitled to statutory priority under 11 U.S.C. § 503(b)(9)). The Downstream Purchasers calculated that in addition to being paid for July's deliveries, the Producers were also paid approximately 12.9% for sales between June 1 and July 1, 2008. *See, e.g.*, BP Renewed Mot. Summ. J. 10 [Adv. No. 09-50105, Docket No. 702].

[36] *See* Plan § 3.1(c); Confirmation Order ¶ 75.

[37] Adv. No. 09-50038, Docket No. 6.

decide the Tender Adversaries, and further held that abstention would not be appropriate.[38]

In late 2010, the Downstream Purchasers filed motions for summary judgment in their respective Tender Adversaries.[39] In short, the Downstream Purchasers sought summary judgment on three principal independent grounds: (i) the Downstream Purchasers took oil and gas from the Debtors as buyers for value under the Uniform Commercial Code ("U.C.C.") § 9-317; (ii) the Downstream Purchaser took oil and gas from the Debtors as buyers in ordinary course pursuant to U.C.C. § 9-320; and (iii) the Producers expressly or implicitly waived their interests when they sold or transferred the oil and gas to the Debtors. The Producers opposed these Motions as premature in the absence of meaningful discovery, and therefore requested a continuance to conduct discovery pursuant to Federal Rule of Civil Procedure 56(d).[40]

The Producers sought discovery on factual matters ranging from the tracing of oil from the Producers through the Debtors to the Downstream Purchasers, the nature of the transactions between the Debtors and the Downstream Purchasers (including the Downstream Purchasers' awareness of the Debtors' deteriorating financial condition), and the Downstream Purchasers' pre-petition institutional knowledge of the Producers' statutory liens in oil and gas created by state law. By Opinion and Order dated June 20, 2011 (the "Discovery Opinion"), the Court granted the Producers' motion for a continuance to allow limited discovery to go forward with respect to information relevant to the Downstream Purchasers' defenses to the enforceability of the Producers' asserted liens. *J. Aron & Co. v. Semgroup, L.P. (In re SemCrude, L.P.)*, Adv. No. 09-50038(BLS), 2011 WL 2471002, at *8 (Bankr. D. Del. June 20, 2011). The Discovery Opinion specifically addressed the following as issues appropriate for discovery: (i) whether the Producers waived their liens, if any; (ii) under § 9-317(b), whether the Downstream Purchasers took oil and gas free and clear of any liens as "buyers for value" and without knowledge of any existing liens;

---

[38] Adv. No. 09-50038, Docket No. 227. The Producers filed motions for leave to appeal that decision in the United States District Court for the District of Delaware. The District Court denied the motions by Order dated June 21, 2012 [Docket No. 9274].

[39] *See* J. Aron Mot. Summ. J. [Adv. No. 09-50038, Docket No. 358]; BP Mot. Summ. J. [Adv. No 09-50105, Docket No. 328].

[40] Adv. No. 09-50105, Docket No. 362.

(iii) under § 9-320, whether the Downstream Purchasers took oil and gas as "buyers in ordinary course," in good faith, and without knowledge that the sale violated the Producers' rights. *Id.* at *7.

Following the issuance of the Discovery Opinion, the parties negotiated a schedule and ground rules for conducting the discovery authorized by the Court.[41] The record reflects that over 150 depositions were taken at a variety of agreed-upon locations across the country, and hundreds of thousands of pages of documents were produced by both sides.

In August 2012, upon completion of the discovery described above, the Downstream Purchasers renewed their Motions in the Tender Adversaries.[42] The parties, all represented by able counsel, have submitted dozens of briefs on the Motions with detailed references to the now well-developed record.[43] The Court held three days of oral argument. The matter has been fully briefed and is ripe for decision.[44]

## II. JURISDICTION & VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), with the Court determining that this matter is "related to" the Debtors' Chapter 11 cases. Venue is proper in this Court and in this

---

[41] The Court entered the Global Scheduling Order on August 8, 2011 [Adv. No. 09-50038, Docket No. 507].

[42] *See* J. Aron Renewed Mot. Summ. J. [Adv. No. 09-50038, Docket No. 660]; BP Renewed Mot. Summ. J. [Adv. No. 09-50105, Docket No. 702].

[43] Prior to this Court's hearing for oral argument on the Motions, a number of parties to this litigation reached settlements in principle of certain claims subject to the Motions. As noted in the Certification of Counsel Regarding Settlement Claims submitted at the Court's request to specify the claims affected by these prospective settlements, the settling parties asked the Court, and the Court agreed, to hold the Motions in abeyance pending final documentation of their respective settlements [Docket No. 9408]. *See also* Adv. No. 09-51003, Docket Nos. 764 & 765 (letters from counsel requesting the Court further hold the Motions in abeyance pending final documentation of the settlements). It is the Court's understanding that documentation of these settlements has now been completed.

[44] These proposed findings of fact and conclusions of law do not discuss or analyze the rights and obligations of parties who have since settled. In addition, the Court does not cover herein the adversary proceeding between New Dominion and J. Aron [Adv. No. 11-51774]. That matter remains *sub judice* and the Court will separately issue proposed findings of fact and conclusions of law relating thereto.

District pursuant to 28 U.S.C. §§ 1408, 1409.   These adversary proceedings constitute non-core proceedings under 28 U.S.C. § 157(c)(1).   *See Arrow Oil & Gas, Inc. v. J. Aron & Co. (In re SemCrude, L.P.)*, 442 B.R. 258, 271 (Bankr. D. Del. 2010).   As such, and in accordance with Fed. R. Bankr. P. 9033(a), the Court herewith files its proposed findings of fact and conclusions of law.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences in favor of that party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).   Any doubt must be resolved in favor of the non-moving party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The movant bears the initial burden of establishing the absence of a genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   Once the moving party carries its burden, the opposing party must go beyond the pleadings and identify specific facts showing more than a "mere existence of a scintilla of evidence" that a genuine dispute of material fact exists.   *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts").

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine dispute of material fact for trial. *See Celotex*, 477 U.S. at 317.   Substantive law determines which facts are material.   *Anderson*, 477 U.S. at 248.   Only facts that "might affect the outcome of the suit under governing law" are considered material and will preclude summary judgment.   *Id.*   Further, a dispute regarding a material fact is genuine "when reasonable minds could disagree on the result."   *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.   Thus, the Court must ask: "(1) is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?"   *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (quoting *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1060 (3d Cir. 1991).

## IV. THE PARTIES' POSITIONS

The Producers are pursuing claims against the Downstream Purchasers.   As noted above, the Producers sold oil and gas to the Debtors before the Petition Date, for which they were not paid.   The

Producers have settled with the Debtors and the Banks for a partial recovery,[45] and seek to collect the balance from the Downstream Purchasers. The Downstream Purchasers assert a multitude of statutory and non-statutory defenses to the Producers' claims. The Downstream Purchasers' arguments, and the Producers' responses, are listed below.

## A. Buyer For Value Defense

The Downstream Purchasers first contend that under U.C.C. § 9-317, they qualify as a buyer for value ("BFV").[46] A BFV takes free of all security interests if the buyer gives value and receives delivery of the collateral without actual knowledge of the security interest and before perfection. They argue that the Producers never perfected and that they gave value in the form of oil setoff and payments. The Downstream Purchasers also argue that they did not have any actual knowledge of the alleged security interests and state that the Producers cannot rely on circumstantial evidence to prove actual knowledge. Finally, they argue that express warranties stating that the Debtors sold oil and gas to them free and clear of any security interest negates actual knowledge. If the Downstream Purchasers are found to be buyers for value, they contend that this finding would be a complete defense to the Producers' claims.

The Producers respond that the BFV defense cannot apply to their security interests because BFV is not specifically enumerated in the state lien laws at issue. The Producers also argue that whether the Downstream Purchasers provided "value" is a disputed issue of material fact, and that they can prove "actual knowledge" by circumstantial evidence.

---

[45] Boiled down to its essence, the record reflects that oil and gas delivered prior to June 1, 2008 was paid for in full. As of the Petition Date, the Debtors had not paid for oil and gas delivered from June 1, 2008 through July 21, 2008, a total of 51 days. Pursuant to 11 U.S.C. § 503(b)(9), the Court authorized payment in full for oil and gas delivered in the 20 days leading up to the bankruptcy filing. The parties' submissions further reflect that the Producers have received distributions under the confirmed Plan equal to approximately 12.9% of their allowed claims. This litigation therefore concerns the Producers' efforts to collect, from the Downstream Purchasers, the remaining unpaid balance (equal to approximately 27 days of oil and gas deliveries).

[46] Applicable state statutes each provide for the BFV defense. *See, e.g.,* Tex. Bus. & Com. Code § 9.317(b) (2005); Kan. Stat. Ann. § 84-9-317(b) (2007); Okla. Stat. tit. 12A, § 1-9-317(b) (2005).

## B. Buyer in the Ordinary Course Defense

The Downstream Purchasers argue that they are buyers in the ordinary course ("BIOC") under U.C.C. § 9-320 and take free of the Producers' alleged security interest.[47]   The Downstream Purchasers argue that they bought oil and gas from the Debtors in good faith, in the ordinary course of business, and without knowledge of any violation of the Producers' alleged security interest; as a BIOC, the Downstream Purchasers contend that they should be fully insulated from the Producers' claims.

The Producers contend that the transactions were not in the ordinary course because the sales were abnormally large in the months leading up to the Debtors' bankruptcy filing.  The Producers also argue that the Downstream Purchasers' setoff of money owed with oil does not create "new value."  The Producers next challenge whether BP and J. Aron's transactions with the Debtors were in good faith.  They allege that BP and J. Aron used cross-product netting to hedge financial derivative exposure with the Debtors rather than buying oil in the ordinary course.  The Producers contend that disputes of material fact exist as to each element of the BIOC defense asserted here, rendering summary disposition inappropriate.

## C. Recoupment

If a security interest exists and the Downstream Purchasers cannot prove up the defenses of BFV or BIOC, they argue that the Producers rights' are subject to recoupment rights arising out of their contracts with the Debtors.  Under U.C.C. § 9-404, the Downstream Purchasers argue that any interest provided to the Producers by the state lien laws is subordinate to the Downstream Purchasers' rights under the netting agreements.  They contend that the Producers are effectively assignees of the Debtors' accounts receivable, and argue that the Producers cannot have greater rights in these accounts receivable than the Debtors had.

The Producers respond that they are not claiming any security interest in the Debtors' accounts receivable; their liens are against oil and gas, and the proceeds thereof.  As such, they argue that this statute simply does not apply because there is no recoupment defense against

---

[47] The state lien laws all incorporate the BIOC defense.  *See* Tex. Bus. & Com. Code § 9.343(e) (2001); Kan. Stat. Ann. § 84-9-339a(e) (2006); Okla. Stat. tit. 52, § 548.2 repealed by Okla. Stat. tit. 52, § 549.6 (2010).

third party's security interest in physical property, *viz.*, the oil and gas delivered by the Debtors to the Downstream Purchasers.

## D. Waiver

The Downstream Purchasers argue that the Producers waived any security interest pursuant to U.C.C. § 9-315 when they sold the oil and gas to the Debtors. The Downstream Purchasers argue that some of the Producers expressly authorized the oil to be sold free of any security interest because certain Producers included an express contractual warranty selling free and clear of all liens when the Producers sold to the Debtors. Because none of the Producers placed restrictions on what the Debtors could do with the oil and gas it received, the Downstream Purchasers contend that the Producers implicitly waived any security interest or other rights over the oil and gas delivered to the Debtors.

The Producers respond that they did not expressly or impliedly authorize the Debtors to resell the oil and gas free of their alleged security interest. They argue that waiver is a uniquely factual issue and thus, not readily susceptible to disposition on summary judgment. The Producers also allege that the purported waiver in the contracts was boilerplate language that appears in only fifteen of the Producers' contracts with the Debtors.

## E. Tort and Equitable Claims, and Constitutional Arguments

The Producers assert claims for conversion, tortious interference, unjust enrichment and *quantum meruit*, money-had-and-received, accounting and disgorgement, and fraud. The Downstream Purchasers argue that all of these common law claims turn on the lien analysis addressed above. They allege that if the Producers do not prevail on their statutory lien claims, then these derivative claims must also fail. The Downstream Purchasers next argue substantive independent defenses to each of these claims.

The Downstream Purchasers also contend that the state statutes are unconstitutional if construed to have legal force past the first purchaser. They allege that these statutes would broadly and unlawfully regulate interstate commerce by allowing secret liens to follow oil and gas through interstate commerce. The Downstream Purchasers further allege that the statutes violate the Takings Clause because the statutory liens constitute a taking without fair notice or compensation.

The Producers contend that the state lien statutes are constitutional.  They argue that the Dormant Commerce Clause is not implicated here because there is no discrimination against out-of-state citizens and no impermissible benefit to local citizens.  The Producers also argue that the lien statutes do not constitute a taking because they do not deprive the Downstream Purchasers of all economically beneficial use of the property.

## F. Orange Creek

Orange Creek asserts statutory lien claims and common law claims on behalf of Clipper Energy, LLC and Central Kansas Crude, LLC ("CKC").  The Downstream Purchasers argue that Orange Creek cannot pursue these claims on behalf of CKC because CKC is not an "interest owner" or "operator" under the Kansas statute and the Debtors were not the first purchaser of the oil it purchased from CKC.[48]  Moreover, BP argues that it could not have received any of Orange Creek's oil because its oil could not reach Cushing, Oklahoma.

Orange Creek responds that joint operating agreements authorize it to bring claims on behalf of the interest owners.  Orange Creek also argues that it is an "operator," and operators can bring claims on behalf of interest owners.  However, if the Court finds that it does not have authority, Orange Creek argues that it should be permitted time to obtain ratification from the interest owners.

## G. Oklahoma Claims Under the PRSA[49]

J. Aron seeks summary judgment for all Oklahoma Producers' claims under the PRSA.  J. Aron argues that because this Court has already ruled that the Oklahoma PRSA does not create a trust,[50] all claims are prohibited by collateral estoppel.  Even if collateral estoppel did not apply, J. Aron argues that there are no statutory torts in the PRSA.  Further, there was no violation of the statute, and thus, J. Aron argues that it cannot be liable for tort damages.

IC-CO responds that the PRSA imposes legal duties on the Downstream Purchasers, which are distinct from the trust issue that was previously decided by the Court.  IC-CO argues that these legal duties were violated when interest owners, such as IC-CO, were not paid for oil and gas that they sold to the Debtors.  IC-CO also argues

---

[48] *See, e.g.*, BP Renewed Mot. Summ. J. ¶ 43 [Adv. No. 09-50105, Docket No. 702].

[49] Production Revenue Standards Act, Okla. Stat. tit. 52, § 570.1 *et seq.*

[50] *See Samson Res. Co. v. SemCrude, L.P.*, 407 B.R. 140, 153 (Bankr. D. Del. 2009).

that none of the aforementioned statutory defenses apply since this is a tort claim. IC-CO contends that this claim creates a factual issue that cannot be resolved on summary judgment.

## V. LEGAL ANALYSIS

### A. Buyer For Value Defense

The Court turns first to the BFV defense under U.C.C. § 9-317 asserted by the Downstream Purchasers.[51] Section 9-317, in pertinent part, states that a buyer takes free of any security interest "if the buyer gives value and receives delivery of the collateral without knowledge of the security interest or agricultural lien and before it is perfected." U.C.C. § 9-317(b).[52] A person "gives value" if the purchase is in return for a binding commitment to extend credit, as security for, or in total or partial satisfaction of a pre-existing claim, by accepting delivery under a pre-existing contract for purchase, or in return for any consideration sufficient to support a simple contract. U.C.C. §§ 1-204(1)-(4). Thus, to

---

[51] As an initial matter, the Court finds that § 9-317 is available to the Downstream Purchasers as a defense notwithstanding the fact that the defense is not expressly enumerated in the state statutes themselves. *See* Tex. Bus. & Com. Code Ann § 9.343(m) (2001); Kan. Stat. Ann. § 84-9-339a(m) (2006); Okla. Stat. tit. 52, § 548.2 (2001). The statutes specifically provide that "[t]he rights of any person claiming under a security interest or lien created by this section are governed by the other provisions of this chapter except to the extent that this section necessarily displaces those provisions." Tex. Bus. & Com. Code Ann. § 9.343(p); Kan. Stat. Ann. § 84-9-339a(o); *see also* Okla. Stat. tit. 52, § 548.6 (stating that nothing in the oil and gas lien act impairs or affects provisions of the U.C.C.). The Court reads these statutes to incorporate the state versions of Article 9 of the U.C.C., including § 9-317, as opposed to negating other U.C.C. provisions, as the Producers argue. *See Mull Drilling Co. v. SemCrude, L.P.*, 407 B.R. 82, 101 (Bankr. D. Del. 2009) ("To embrace the Kansas Producers' argument that Kansas § 9-339a is a self-contained statutory provision would essentially read Kansas § 9-339a(o)'s directive regarding when the section is governed by other Article 9 provisions out of the statute."); *Arrow Oil & Gas, Inc. v. SemCrude, L.P.*, 407 B.R. 112, 130 (Bankr. D. Del. 2009) (similarly construing the Texas statute); *Samson Res. Co. v. SemCrude, L.P.*, 407 B.R. 140, 156-57 (Bankr. D. Del. 2009) (similarly construing the Oklahoma statute).

[52] Oklahoma, Kansas, and Texas have adopted U.C.C. § 9-317 in identical form. *See* Okla. Stat. tit. 12A, § 1-9-317(b) (2005); Kan. Stat. Ann. § 84-9-317(b) (2007); Tex. Bus. & Com. Code § 9.317(b) (2005).

qualify as a BFV, a person must: (i) give value, (ii) without knowledge of the security interest, and (iii) before perfection.[53]

### 1. Value and Perfection

The Court can dispose of the value and perfection prongs of the BFV defense here in summary fashion. "Value" under § 9-317 is any consideration sufficient to support a simple contract. U.C.C. §§ 1-202(b), 9-317. It cannot be seriously argued that "value" was not given under these contracts. Traditional contracts law teaches that a mere peppercorn suffices as consideration.[54]   *See* Restatement (Second) of Contracts § 71 (1981) (stating that all that is required for consideration is a bargained-for exchange); *Id.* § 79 cmt. C ("[C]ourts do not inquire into the adequacy of consideration."); *First Mortgage Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 797 (Del. 1982) (holding that incurring a legal detriment "in and of itself constitutes sufficient consideration"). In fact, the Producers concede that extension of credit is considered "value given."[55]   Therefore, by paying cash, buying and selling oil, netting payments, and buying on credit, the Downstream Purchasers have satisfied the value requirement under § 9-317.

As to perfection, this Court has already ruled that the Producers' security interest, if any, was unperfected. *See Mull Drilling Co.*, 407 B.R. at 110; *Arrow Oil & Gas, Inc*, 407 B.R. at 139-40; *Samson Res. Co.*, 407 B.R. at 157. Thus, no genuine dispute of material fact exists as to whether the Producers' liens were perfected: they were not.

### 2. Knowledge

The knowledge prong of the BFV analysis is more complicated. The parties concede that the term "knowledge" as used in § 9-317 means "actual knowledge." *See* U.C.C. § 1-202(b) ("'Knowledge' means actual knowledge."). Case law teaches that the Court must evaluate a purchaser's actual knowledge at the time of the sale, and any knowledge subsequently gained by the purchaser is irrelevant to the analysis. *See, e.g., Gary Aircraft Corp. v. General Dynamics Corp. (In re Gary Aircraft Corp.)*, 681 F.2d 365, 374 (5th Cir. 1982) (stating that

---

[53] *See generally* 4 White, Summers, & Hillman, Uniform Commercial Code § 33-8 (6th ed. 2010) (discussing buyers of goods under § 9-317).

[54] The English House of Lords has observed that "[a] peppercorn does not cease to be good consideration if it is established that the promisee does not like pepper and will throw away the corn." *Chappell & Co. v. Nestlé Co.*, [1960] A.C. 87 (H.L. 1959).

[55] *See* Producers Omnibus Resp. 35 ("The Associated Producers gave value by extending credit to Debtors.") [Adv. No. 09-50038, Docket No. 701].

knowledge is measured at the time of sale); *see also Snap-On Tools Corp. v. Rice*, 781 P.2d 76, 78 (Ariz. Ct. App. 1989) ("The purchaser must have actual knowledge that the security interest exists at the time the collateral is purchased."). Moreover, a buyer has no duty to inquire into whether a security interest exists. *See Clark Oil & Ref. Co. v. Liddicoat*, 223 N.W.2d 530, 536 (Wis. 1974) (holding that "[w]hether the judgment creditor had reason to know, or might have been alerted to, circumstances that should reasonably have impelled him to check beyond the filed record is irrelevant..."). Finally, and importantly for this case, "[t]estimony as to general knowledge in the industry is insufficient to prove knowledge by a majority of creditors." *In re Downey Creations, LLC*, 414 B.R. 463, 471 (Bankr. S.D. Ind. 2009).

As an initial matter, the extensive record fails to establish any direct evidence of actual knowledge of the asserted liens on the part of the Downstream Purchasers at the time of the transactions. None of the Downstream Purchasers have admitted to having knowledge of the Producers' asserted liens. The Producers do not allege facts tending to show direct evidence of knowledge on the part of the Downstream Purchasers, and it is undisputed that the Producers did not directly inform the Downstream Purchasers of their alleged security interest, or give them notice of any kind.[56]

Instead, the Producers point to limited circumstantial evidence developed through discovery to show actual knowledge of the security interest. The Producers' evidence boils down to the Downstream Purchasers' alleged knowledge of (i) state lien laws, (ii) the identities of some of the Producers, and (iii) the fact that the Producers were unpaid.

The parties dispute as a threshold matter whether circumstantial evidence can ever be sufficient to prove actual knowledge of the security interest. As discussed in depth below, the Court finds that actual knowledge may be proven by circumstantial evidence, but the standard is high.

---

[56] *See* Levine Decl., Tables 4 & 5 (listing citations to deposition testimony supporting the propositions that (i) the Producers took no steps to notify J. Aron of their alleged security interests; and (ii) J. Aron had no communications with any Producer) [Adv. No. 09-50038, Docket No. 663]; Byroade Decl. in Support of BP Renewed Mot. Summ. J. Exs. G, N-Q (providing excerpts of deposition testimony supporting the proposition that BP lacked direct knowledge of the Producers' alleged interests) [Adv. No. 09-50105, Docket No. 702].

The Producers rely principally upon two cases[57] for the proposition that actual knowledge may be proved by circumstantial evidence. *See Longtree, Ltd. v. Res. Control Int'l, Inc.*, 755 P.2d 195, 202 (Wyo. 1988); *Freeman v. Bentley*, 422 S.E.2d 435, 437 (Ga. App. 1992). In *Longtree*, the Supreme Court of Wyoming held that although there was no direct evidence of actual knowledge on the part of the buyer, there was sufficient circumstantial evidence to support a finding of actual knowledge. That court stated:

> Longtree knew that RCI was virtually the only logger supplying logs to Pacific Star. The quantity of logs supplied and to be supplied by RCI was enormous. Mr. Diehl knew that Pacific Star had experienced financial difficulties in the past. He also knew that Pacific Star had been closed by creditors in 1984. Both Mr. Diehl and Mr. Beck knew that Jones did not have funds to satisfy his obligations to the Bank of California yet logs were still being supplied. Mr. Diehl and Mr. Beck sought to avoid the Bank of California's claim to the logs by structuring its transaction with Pacific Star as a purchase and sale rather than a financing arrangement, which was the same approach used by RCI. Mr. Diehl and Mr. Beck sought to avoid claims by loggers against the winter log deck by requiring that Longtree's logs be kept separate and by requiring loggers' invoices and evidence that previously received logs had been paid for. Finally, *Mr. Jones told Jerry Harmon that Longtree was aware of RCI's claim* to the logs.

*Longtree*, 755 P.2d at 202 (emphasis added). Although Longtree's witnesses denied actual knowledge, there was significant evidence in the record that they, in fact, had actual knowledge of the security interest at issue. The court stated that "the trier of fact may well conclude that where ignorance could not reasonably exist a person did in fact have knowledge." *Id.* at 203 (citation omitted).

---

[57] The Producers also cite multiple cases construing "knowledge" in the aiding and abetting context. *See Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 525 (6th Cir. 2000) (stating that circumstantial evidence may prove knowledge in aiding and abetting cases); *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985) (same); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975) (same). The Court does not consider these cases to be indicative of how the U.C.C. treats "actual knowledge," and declines to consider them in this context.

In *Freeman*, the second case relied upon by the Producers, the Georgia Court of Appeals acknowledged that circumstantial evidence can prove actual knowledge, but held that the facts presented failed to prove actual knowledge. *See* 422 S.E.2d at 437. The court reversed the lower court's finding that the circumstantial evidence supported actual knowledge and held that "[t]here is no direct evidence, and insufficient circumstantial evidence for an inference that Freeman had actual knowledge of Mrs. Bentley's unrecorded and unperfected security interest." *Id.* The court went on to hold that even if Mr. Freeman was aware of the divorce decree that incorporated Mrs. Bentley's security interest, "the leap from this knowledge to knowledge of the security interest is too great to be accomplished on the strength of tenuous inference." *Id.* The Court agrees with these decisions holding that circumstantial evidence can prove actual knowledge, but it is apparent that the burden is a heavy one.

Here, the Producers' proffered circumstantial evidence is insufficient to demonstrate that the Downstream Purchasers had actual knowledge of a security interest in the oil and gas at the time of sale.[58] First, knowledge of the identities of some of the Producers certainly does not demonstrate actual knowledge of a security interest. The Downstream Purchasers dispute having actual knowledge of the Producers' specific identities.[59] Leaving this dispute aside,[60] it is

---

[58] Citing *Longtree*, the Producers urge the Court to find that circumstantial evidence demonstrates the Downstream Purchasers' actual knowledge. But that case is readily distinguishable. *Longtree* involved disputed direct evidence and overwhelming circumstantial evidence. *See* 755 P.2d at 203. The record here does not reflect either direct or circumstantial evidence approaching the weight of the evidence in *Longtree*.

[59] While the Downstream Purchasers may have had partial or anecdotal knowledge of some of the Producers (perhaps as a result of geographic proximity or familiarity with the Debtors' business operations), the record reflects that the specific identities of the Producers were not generally known. The Producers allege that, out of a network of approximately 2,000 independent producers, J. Aron knew the identities of only a few. *See* Producers Opp'n to J. Aron Renewed Mot. Summ. J. 25-26 (citing deposition testimony) [Adv. No. 09-50038, Docket No. 704]. In addition, the Producers assert that BP had "general knowledge" of the purchase of crude from the Producers and "would have known" the identity of certain of the Producers under the circumstances, but they do not allege that BP had specific knowledge of the Producers' identities. *See* Producers Opp'n to BP Renewed Mot. Summ. J. 25-26 [Adv. No. 09-50105, Docket No. 741].

immaterial whether they knew the identities of any Producers because that knowledge does not establish knowledge of the Producers' alleged security interests in the purchased oil.

Second, knowledge of non-payment does not help the Producers prove actual knowledge of the security interest *at the time of the transactions*. It is undisputed that oil and gas are generally not paid for until the following month.[61] Thus, at the time of the transactions, there was no way for the Downstream Purchasers to know with certainty that the Debtors would not eventually pay the Producers, as and when due. As a related matter, evidence proffered by the Producers that the Downstream Purchasers were aware of the Debtors' liquidity problems does not constitute proof of actual knowledge that the Producers would not be paid.

Turning to knowledge of the lien laws, the Court first observes that, as a general proposition, parties are charged with knowledge of the law. *See Moore v. Brown*, 52 U.S. 414, 424 (1850) (applying the maxim *ignorantia facti excusat; ignorantia juris non excusat*). Notwithstanding this hoary and uncontested proposition, however, imputed knowledge of applicable law is not enough to show that the Downstream Purchasers had actual knowledge of the Producers' alleged security interest. Knowledge of the state lien laws merely establishes that the oil could have been subject to security interests or possibly gave the Downstream Purchasers reason to know of a security interest, but the Downstream Purchasers were under no duty to inquire. *See Clark Oil & Ref. Co.*, 223 N.W.2d at 536. A reason to know of a security interest is not enough to show actual knowledge, and the Downstream Purchasers were under no duty to check for any security interests beyond what was filed.[62] *Id.*

---

[60] Or, more accurately, viewing the evidence in the light most favorable to the Producers as the non-moving party. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).

[61] *See, e.g., Samson Res. Co. v. SemCrude, L.P.*, 407 B.R. 140, 147 (Bankr. D. Del. 2009) ("The industry custom is that purchasers of oil and gas pay amounts due to the owners on the 20th day of the month following the delivery of oil and on the 25th day of the month following delivery of gas.").

[62] It is undisputed that the Producers never filed U.C.C. financing statements to perfect their alleged security interest. *See, e.g.*, Levine Decl. Table 3 (listing citations to deposition testimony from the Producers that no steps were taken to perfect their alleged security interests) [Adv. No. 09-50038, Docket No. 663].

More importantly, the Debtors expressly warranted to the Downstream Purchasers that the oil was not subject to any liens,[63] and thus the existence of the lien statutes is immaterial as to the Purchasers' actual knowledge of a security interest. When a seller provides a buyer with an express warranty that the goods purchased are sold free and clear of all liens, there can be no actual knowledge of the alleged security interest. *See CIT Group/Commercial Servs., Inc. v. Constellation Energy Commodities Group*, No. 12-16-ART, 2012 WL 4603049, at *9 (E.D. Ky. Sept. 30, 2012) (affirming the bankruptcy court in *In re Black Diamond Mining Co.*). The Producers do not cite one case, and the Court is not aware of one, where a party has established actual knowledge of a security interest in the face of an express warranty stating that no security interest exists.

To the contrary, case law supports the proposition that an express "free and clear" warranty precludes a finding of actual knowledge of a security interest. The district court in *Black Diamond* directly considered this issue in the context of § 9-320. *Id.* The court wrote that "Black Diamond specifically guaranteed that it 'had good title' to the coal, had 'the right to sell' the coal to Commodities, and 'that [the coal] *shall be free from all liens, encumbrances and claims.*' Consequently, Commodities acquired the coal without knowledge that its purchases violated CIT Group's inventory lien." *Id.* (emphasis in original); *see also Victory Nat'l Bank of Nowata v. Stewart*, 636 P.2d 788, 790 (Kan. Ct. App. 1981) (holding that a buyer who purchases goods subject to an express warranty that the goods are free from all liens takes free of any unperfected security interest). The bankruptcy court

---

[63] The terms of the Conoco General Provisions incorporated into the Debtors' agreements with the Downstream Purchasers governing the sale of oil and gas include express warranties that the oil and gas is not subject to any liens or encumbrances. *See* Conoco General Provisions, Producers Omnibus Resp. Ex. 1 ¶ B [Adv. No. 09-50038, Docket No. 701]. The Downstream Purchasers cite to these agreements for the proposition, uncontested by the Producers, that the Debtors gave express warranties of good title. *See* Zutshi Decl. Ex. F (evidencing voluminous sale confirmations memorializing J. Aron's purchases of oil from the Debtors and providing that the transactions "shall be in accordance with [the] Conoco General Provisions for domestic crude oil transactions dated January 1993," effectively incorporating the warranty of good title therein) [Adv. No. 09-50038, Docket No. 664]; Byroade Decl. in Support of BP Renewed Mot. Summ. J. Ex. C (evidencing BP's trade confirmations providing that the "Conoco General Provisions [dated] January 1, 1993 shall govern this transaction") [Adv. No. 09-50105, Docket No. 702].

in *Black Diamond* also noted that the warranty provision appeared to be "a critical part of Commodities' agreements with Black Diamond given that some of the coal purchased by Commodities was then resold to downstream counterparties." *In re Black Diamond Mining Co.*, No. 08-70066, 2011 WL 6202905, at *5 n.15 (Bankr. E.D. Ky. Dec. 13, 2011) *aff'd in part, rev'd in part sub nom. CIT Group/Commercial Servs., Inc. v. Constellation Energy Commodities Group*, No. 12-16-ART, 2012 WL 4603049 (E.D. Ky. Sept. 30, 2012) *reh'g denied*, 2013 WL 85208 (E.D. Ky. Jan. 7, 2013). The court explained that such representations are standard in the industry and coal is generally not sold subject to any liens or encumbrances. *Id.* Further, Black Diamond's CEO and CFO testified that they believed that the coal was sold free of any encumbrances or liens. *Id.*

The Court finds these facts directly analogous to the case at bar. In the face of an express warranty, the court in *Black Diamond* ruled that actual knowledge could not be established. The record reflects, and it is undisputed, that the Debtors sold oil and gas to the Downstream Purchasers pursuant to contracts incorporating express warranties that the oil and gas was free of all security interests. All of the Downstream Purchasers' contracts with the Debtors reference the Conoco General Provisions.[64] The Conoco General Provisions include the following term: "[t]he Seller warrants good title to all crude oil delivered hereunder and warrants that such *crude oil shall be free from all royalties, liens, encumbrances* and all applicable foreign, federal, state and local taxes."[65] Not only were the Downstream Purchasers under no duty to inquire into potential security interests in the product, but they received express warranties that the product was not subject to any security interests.[66] Like the warranty provision in *Black Diamond*, the

---

[64] *See supra* note 63.

[65] Conoco General Provisions ¶ B (emphasis added).

[66] Separate and apart from the Debtors' warranty that the product was free from all liens and encumbrances, some of the Producers sold product to the Debtors pursuant to contracts incorporating the same express warranties of the Conoco General Provisions. *See* Producers Omnibus Resp. Exs. 7, 12 [Adv. No. 09-50038, Docket No. 701]. The Producers assert that only fifteen Producers used this warranty in their agreements with the Debtors. *See* Producers Omnibus Resp. 40; Levine Decl. Table 1 [Docket No. 663]; Zutshi Decl. Ex. K [Adv. No. 09-50038, Docket No. 664]. Accordingly, any Producers who sold oil under an express warranty that the oil was free of all liens and encumbrances have effectively waived any statutory security interest in the oil sold. *See ITT Fin. Servs. v. Schoenlein (In re Schoenlein)*, 157 B.R. 824, 827-28

record reflects that the applicable terms—here the Conoco General Provisions—are standard in the industry.[67] Further, discovery taken in these adversary proceedings reflects that the Downstream Purchasers consistently testified that they were unaware of the lien statutes and believed that the product was sold free and clear of liens.[68] Nothing in the record undercuts the Downstream Purchasers' reasonable reliance on the warranty from the Debtors. As such, the Court finds that the Downstream Purchasers did not have actual knowledge of the Producers' alleged security interest in the oil and gas.[69]

　　To summarize, the extensive discovery conducted by the parties on the discrete issue of knowledge fails to show that the Downstream Purchasers had actual knowledge of the security interest at the time of the transactions. It is undisputed that no direct evidence exists to establish actual knowledge, *i.e.*, the Producers did not notify the Downstream Purchasers of their alleged security interest (or otherwise

---

(Bankr. N.D. Ohio 1993) (noting that a creditor cannot claim a security interest in a television if it has previously disclaimed all security interests in that television).

[67] *See, e.g.*, Beskrone Decl. Ex. B, Navarro Dep. 229:2-22, June 28, 2012 (stating that the Debtors have used the Conoco General Provisions in contracts for many years) [Docket No. 9315].

[68] *See, e.g.*, Newman Decl. Ex. A, Schwartz Dep. 134:23-135:7, June 5, 2012 (testifying that he believed that J. Aron "had clear title to the oil, otherwise we never would have entered into [the contracts]") [Adv. No. 09-50038, Docket No. 662]; Newman Decl. Ex. A, Griggs Dep. 342:16-19, Jan. 19, 2012 (testifying that he was unaware of the lien statutes); Newman Decl. Ex. A, Bricker Dep. 316:21-317:8, March 1, 2012 (same); Newman Decl. Ex. A, Foster Dep. 249:11-252:20, May 16, 2012 (same). Additionally, some of the Producers themselves stated that they sold the oil and gas without restrictions and with the expectation that the Debtors would resell it. *See* Byroade Decl. in Support of BP Renewed Mot. Summ. J. Ex. E (compiling citations to deposition testimony supporting this proposition) [Adv. No. 09-50105, Docket No. 702].

[69] To the extent that Producers argue that the Conoco General Provisions are simply boilerplate language that should not be enforced against them, the Court disagrees. Producers cite no cases for the proposition that boilerplate provisions are not binding. To the contrary, the case law supports the opposite conclusion. *See, e.g.*, *In re Madera*, 445 B.R. 509, 514 (Bankr. D.S.C. 2011) (holding that boilerplate language in a confirmation plan is binding if confirmed); *Lambert v. Kysar*, 983 F.2d 1110, 1119 (1st Cir. 1993) (enforcing a boilerplate forum selection clause). The contracts here, entered into by sophisticated parties engaging in complex transactions, bind the parties to the incorporated terms of the industry-standard Conoco General Provisions.

contact the Downstream Purchasers in any way). Moreover, the marginal circumstantial evidence presented by the Producers does not rise to the level of actual knowledge. To compound the problem for the Producers, the Debtors expressly warranted to the Downstream Purchasers that the product was free of any security interest (and some Producers did as well on their oil and gas sales to the Debtors).

In light of the foregoing analysis, the Court finds that there are no issues of material fact that the Downstream Purchasers gave "value," before perfection, and without knowledge of the security interest. Therefore, the Court recommends that the Defendants be granted summary judgment as buyers for value under § 9-317.

## B. Buyer in the Ordinary Course Defense

Because the Court finds in favor of the Downstream Purchasers under the BFV defense, the Court need not reach the merits of their other defenses. However, in the interest of completeness and given the time and effort invested by the parties into certain of these arguments, the Court turns next to the BIOC defense under § 9-320. The Downstream Purchasers contend that, having purchased oil and gas from the Debtors in the ordinary course of business, they are completely insulated from any remaining liability to the Producers. As set forth in detail below, the Court finds that the Downstream Purchasers satisfy the BIOC requirements, and therefore, and in addition to the BFV defense, the Court recommends that the Defendants are entitled to summary judgment on this separate ground.

A BIOC "takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." U.C.C. § 9-320(a).[70] A BIOC is defined by the U.C.C. as:

> [A] person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person...in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in

---

[70] The Kansas, Texas, and Oklahoma state statutes at issue also incorporate the BIOC defense. *See* Tex. Bus. & Com. Code Ann. § 9.343(m)(1) (2001) ("A person who buys from a first purchaser can ensure that the person buys free and clear of an interest owner's security interest or statutory lien under this section: (1) by buying in the ordinary course of the first purchaser's business from the first purchaser under Section 9.320(a)."); Kan. Stat. Ann. § 84-9-339a(m)(1) (2006); Okla. Stat. tit. 52, § 548.2 (2001).

> the kind of business in which the seller is engaged or with the seller's own usual or customary practices…A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale…"Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

U.C.C. § 1-201(9). The classic application of BIOC protections is in the context of a buyer purchasing from a seller's inventory where the buyer may be aware of an inventory lien in favor of the seller's lender. BIOC protections facilitate commerce by assuring that good title is acquired, notwithstanding a prior lien. A buyer takes subject to the security interest only if the buyer knows that the sale violates a term in an agreement with the secured party. *See* U.C.C. § 9-320 cmt. 3. A buyer's status, for BIOC purposes, is determined at the time of the sale. *See, e.g., In re Black Diamond Mining Co.*, No. 08-70066, 2011 WL 6202905, at *21 (Bankr. E.D. Ky. Dec. 13, 2011) ("Once a party qualifies as a BIOCB, such status cannot change retroactively due to the occurrence of subsequent events.") (citing *Gary Aircraft Corp. v. Gen. Dynamics Corp. (In re Gary Aircraft Corp.)*, 681 F.2d 365, 374 (5th Cir. 1982)). Therefore, to prevail, the Downstream Purchasers must show that there is no genuine dispute of material fact that they bought oil and gas from the Debtors (i) in good faith, (ii) without knowledge that the sale violated the Producers' rights, (iii) and in the ordinary course.

### 1. Good Faith

"Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." U.C.C. § 1-201(20). This definition includes both the subjective element of honesty in fact and the objective element of the observance of reasonable commercial standards of fair dealing. *Id.* cmt. 20. A good faith purchaser remains one so long as its decision-making with regard to the contract is commercially reasonable. *See In re Arlco, Inc.*, 239 B.R. 261, 271 (Bankr. S.D.N.Y. 1999). Courts also consider whether the parties entered into arm's length contracts. *See CIT Group/Commercial Servs. Inc. v. Constellation Energy Commodities Group*, No. 12-16-ART, 2012 WL 4603049, at *8 (E.D. Ky. Sept. 30, 2012) ("Commodities and Black Diamond were two sophisticated entities who entered the Coal Supply Agreements at arm's length."). Finally, courts do not look at

subsequent actions by the parties when determining a party's BIOC status. *See In re Black Diamond Mining Co.*, 2011 WL 6202905, at *21.

With respect to J. Aron, the Producers call into question "whether Aron took the crude oil in good faith" because discovery "has confirmed that Aron assisted SemGroup in a recklessly speculative trading strategy."[71] Similarly, the Producers allege that BP purchased oil from the Debtors in order to collateralize its exposure on derivative contracts, and that these purchases were abnormally large for the months of June and July.[72] The Producers argue that the Downstream Purchasers allowed the Debtors to use the Producers' unpaid-for oil as collateral for derivatives trading, and that, in light of their netting agreements and alleged knowledge of the lien statutes, a fact issue exists as to whether the contracts were entered into in good faith.

The Court finds that no genuine dispute of material fact exists that the Downstream Purchasers bought and sold product in good faith. The Producers do not point to any evidence indicating that the Downstream Purchasers offered or provided less than fair market value. They also do not allege an absence of arm's length dealings between the parties. Moreover, it is undisputed that the Downstream Purchasers and the Debtors were large, sophisticated entities engaged in the business of buying and selling oil and gas. These undisputed facts tend to show that the agreements were entered into in good faith. *See CIT Group*, 2012 WL 4603049, at *8 (finding good faith where contracts were entered into at arm's length and for fair value).

Additionally, the Downstream Purchasers were legally permitted to exercise their contractual rights to offset or net liabilities against receivables. Exercising contractual rights cannot negate good faith so long as the parties' actions are commercially reasonable. *See In re Arlco, Inc.*, 239 B.R. at 271; *see also* WILLIAM SIDNEY PORTER (O. HENRY), *The Roads We Take, in* COLLECTED STORIES OF O. HENRY 523, 526 (Paul J. Horowitz ed., 1986) ("Bolivar cannot carry double."). Nothing in the record indicates that exercising these contractual rights was not commercially reasonable,[73] and any intended or unintended economic consequences of the oil transactions do not negate good faith.

---

[71] Producers Opp'n to J. Aron Renewed Mot. Summ. J. 36 [Adv. No. 09-50038, Docket No. 704].

[72] *See* Producers Opp'n to BP Renewed Mot. Summ. J. 30 [Adv. No. 09-50105, Docket No. 741].

[73] It appears that trading oil derivatives and netting under the master netting agreements was a core part of the Debtors' business. *See, e.g.*, Beskrone Decl.

Regardless of any alleged ulterior motive to the transactions, the Downstream Purchasers were legally bound to pay for the oil purchased from the Debtors on the 20th of the following month pursuant to their respective agreements. Had the oil derivatives market stabilized, the Downstream Purchasers might not have been able to offset or net liabilities against receivables owed to the Debtors because the Debtors would not have defaulted. Instead, the Downstream Purchasers would have been legally obligated to provide payment in full for the oil purchased, and there is nothing in the record to suggest they would not have done so. Similarly, there is no evidence to indicate that these transactions were a sham. *See CIT Group*, 2012 WL 4603049, at *8 (holding that Commodities was a good faith purchaser and stating that Commodities' "arrangement was not a sham: Black Diamond delivered coal to Commodities, and Commodities faithfully paid nearly fifty-million dollars for its purchases until Black Diamond's bankruptcy."). Accordingly, the Court finds that there is no material dispute that the contracts were entered into in good faith.

### 2. Knowledge

Under § 9-320, a buyer only takes subject to the security interest if the buyer has knowledge that the sale violates another party's rights. *See* U.C.C. § 9-320 cmt. 3. "Knowledge" in this context means "actual knowledge," and is measured at the time of the sale. *See In re Black Diamond Mining Co.*, 2011 WL 6202905, at *21.

The uncontroverted record demonstrates that the Downstream Purchasers could not have known of a violation of the Producers' alleged security interest at the time of sale. The Debtors were not required to pay the Producers until the 20th or the 25th of the following month per their agreements and the industry standard.[74] Therefore, a

---

Ex. B, Foxx Dep. 232:14-19, June 27, 2012 (testifying that the master netting agreement with BP was entered into in the ordinary course of business) [Docket No. 9315]; Beskrone Decl. Ex. B, Coen Dep. 175:21-25, June 27, 2012 (testifying that the Debtors' derivatives trading with BP was consistent with the company's overall trading strategy); Beskrone Decl. Ex. B, Spaugy Dep. 284:14-285:15, July 3, 2012 (testifying that the Debtors' master netting agreements provided flexibility for the physical traders and for the derivatives trading, which were important aspects of the Debtors' business).

[74] *See supra* note 61; *see also* Conoco General Provisions, Producers Omnibus Resp. Ex. 1 ¶ F (providing that payment is due on or before the 20th of the month following the month of delivery for oil) [Adv. No. 09-50038, Docket No. 701].

violation of the Producers' alleged security interest could only occur, if at all, when the Debtors did not pay the Producers.  As such, it is impossible for the Downstream Purchasers to have knowledge of the violation at the time of the transaction.[75]  Thus, there is no genuine dispute of material fact on this issue.

### 3. Ordinary Course

A person buys goods in the ordinary course "if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices."  U.C.C. § 1-201(b)(9).  A buyer in the ordinary course may buy "for cash, by exchange of other property, or on secured or unsecured credit...."  *Id.*  But a BIOC does not include one who acquires goods "as security for or in total or partial satisfaction of a money debt."  *Id.*  By excluding purchasers in satisfaction of a money debt, "the code requires that a buyer in the ordinary course of business give new value for the goods."  *United States v. Handy & Harman*, 750 F.2d 777, 781 (9th Cir. 1984).  A person gives "new value" if that person provides new consideration.  *See CIT Group*, 2012 WL 4603049, at *11. Thus, courts have consistently held that buying in satisfaction of a pre-existing or antecedent money debt does not qualify as "new value," and therefore, precludes a finding of BIOC.  *See, e.g., Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 649 (5th Cir. 1991) (declining BIOC status because the buyer exercised a pre-existing contract credit against its money obligation and gave no "new value" in exchange); *Handy & Harman*, 750 F.2d at 782 (declining BIOC status because a buyer setoff against a debt already owed).  As previously stated, subsequent actions after the time of sale do not affect the BIOC analysis. *See In re Black Diamond Mining Co.*, 2011 WL 6202905, at *21.

The Producers first argue that the sales between the Downstream Purchasers and the Debtors were not in the ordinary course.  Next, the Producers argue that the Downstream Purchasers did not provide "new value."  Third, the Producers contend that certain Downstream Purchasers acquired the oil as security for or in total or

---

[75] The Producers allege that the Downstream Purchasers had actual knowledge of the Debtors' impending default by the first week of June 2008. Even if the Court assumes the truth of this allegation, that knowledge does not satisfy the requirement of § 9-320 because it still does not show that the Downstream Purchasers had actual knowledge of a *violation* of a security interest *at the time of sale*.  To reiterate, by the nature of the standard transaction terms, a violation could only occur, if at all, after the sale.

partial satisfaction of a money debt.  In particular, the Producers allege that the Downstream Purchasers entered into "cross-product" netting agreements with the Debtors involving netting physical purchases against derivatives trading liability.[76]  They allege that the agreements were not entered into in the ordinary course of business and that the cross-product netting allowed the Downstream Purchasers to acquire oil as security for their derivatives trading exposure.  For the following reasons, these arguments must fail.

The record reflects that the Debtors were in the business of buying and selling oil and gas as a midstream purchaser.  The Debtors bought oil and gas from the Producers and promptly sold it to the Downstream Purchasers.[77]  It is undisputed that the Downstream Purchasers — among the largest energy companies in the world — were also in the business of buying and selling oil and trading oil derivatives.  It is clear to the Court that buying and selling millions of barrels of oil, and trading oil and gas derivatives was ordinary course of business for these parties.

The Producers argue that increases in crude oil purchases by the Downstream Purchasers in June and July of 2008 were so at odds with the parties' past trading history as to render them outside of the ordinary course of business.  A review of the record reveals that J. Aron increased the volume of oil purchases in June 2008, but by no means

---

[76] J. Aron entered into an ISDA Master Agreement in November 2007 under which J. Aron purchased oil and gas from the Debtors and also executed swaps and other derivatives trades.  *See* Zutshi Decl. Ex. E [Adv. No. 09-50038, Docket No. 664].  The ISDA Master Agreement allowed for "cross-product" netting upon default by one of the parties.  *See id.*  ¶¶ 6(a), (e).  This agreement was amended in June 2008 to coordinate physical payments and margin calls to eliminate "daylight exposure."  *See* Newman Decl. Ex. A, Foster Dep. Ex. 118, May 16, 2012 [Adv. No. 09-50038, Docket No. 662]; *see also* Foster Dep. 203:24-204:18 (explaining "daylight exposure").   BP entered into three separate agreements in April 2008.  The Master Net Settlement Agreement governed the netting of physical crude oil purchases and sales between BP and the Debtors.  *See* Lullo Decl. Ex. A [Adv. No. 09-50105, Docket No. 329].  The ISDA Master Agreement governed the financial transactions, including the derivatives trading, between the parties.  *See id.* at Ex. B.  And the EEI Agreement entered into on April 25, 2008, which served as an umbrella agreement that allowed for netting across both agreements, *i.e.*, "cross-product" netting, upon default by one of the parties.  *See id.* at Ex. C ¶ 3.

[77] As discussed above, trading oil derivatives was a core part of the Debtors' business.  *See supra* note 73.

was this increase out of the ordinary.[78] Even if the Producers' allegations were true, these transactions were real purchases of oil, and not sham transactions. *See CIT Group*, 2012 WL 4603049, at *8 (stating that Commodities' "arrangement was not a sham: Black Diamond delivered coal to Commodities, and Commodities faithfully paid nearly fifty-million dollars for its purchases until Black Diamond's bankruptcy"). As in *Black Diamond*, the Debtors actually delivered oil and gas to the Downstream Purchasers, and they in turn paid millions of dollars for it. An increase in sales, by itself, does not operate to turn otherwise ordinary course transactions out of the ordinary.

It is undisputed that the netting agreements between the Downstream Purchasers and the Debtors were customary both in the industry and between these specific parties.[79] The testimony adduced

---

[78] The trading relationship between SemGroup and J. Aron, which commenced in November of 2007 under the ISDA Master Agreement, involved significant volatility in volume. From that time until the Petition Date, J. Aron purchased millions of barrels of oil from the Debtors. The record reflects that five trades were confirmed in June 2008 totaling approximately five million barrels of oil. *See* Zutshi Decl. Ex. F (collecting J. Aron's trade confirmations with the Debtors) [Adv. No. 09-50038, Docket No. 664]. By comparison, in November 2007, over a span of just two days, J. Aron purchased six million barrels. *Id.* Likewise, in December 2007, J. Aron purchased four million barrels. *Id.* Moreover, it was not out of the ordinary for J. Aron to make multiple purchases in the same month. In February 2008, J. Aron made six separate purchases—one more than in June 2008. *Id.* Additionally, the Court finds that the increase in purchases by BP does not bring these transactions out of the ordinary course of business.

[79] Cross-product netting may not be as customary as the netting of physical oil, but it does not turn these otherwise ordinary transactions out of the ordinary course of business. It is alleged that the Debtors had cross-product netting agreements with multiple parties. *See* J. Aron Reply 34-35 (stating that the Debtors had cross-product netting arrangements with J. Aron, BP, Cargill Inc., and Conagra Trade Group, Inc., to which the Producers have not disputed) [Adv. No. 09-50038, Docket No. 716]; *see also* Beskrone Decl. Ex. B, Spaugy Dep. 312:7-10, July 3, 2012 (testifying that the Debtors reached out to ConocoPhillips in 2008 about entering into a master netting agreement) [Docket No. 9315]. Further, the Debtors' cross-product netting arrangements were pre-existing contracts. *See In re Black Diamond Mining Co.*, 2011 WL 6202905, at *22 ("[T]he coal delivered by Black Diamond to Commodities pursuant to the Invoices was sold 'pursuant to a preexisting contract,' further confirming Commodities' status as a BIOCB."). For example, J. Aron's ISDA Master Agreement provided for cross-product netting, which was entered

through discovery indicates that the oil and gas industry depends on netting agreements because there is not enough liquidity available to support the daily volume of purchases and sales in this market.[80]   The Debtors would have been forced to take out large amounts of debt to buy and sell oil.[81]   Instead of incurring the costs and burdens of such massive borrowing, players in this industry regularly net obligations.[82] Therefore, the Court finds that the sales and the netting agreements were made in the usual and customary practices of the Debtors.

The Court rejects the Producers' second argument, that netting does not create "new value."   At argument, the Producers' counsel acknowledged that netting is rational behavior, but stated that "we contend that the way the statute is written in these types of situations...you have a problem being a buyer in the ordinary course [if you utilize netting]."[83]   The Court finds this contention, in light of established practices in the oil and gas industry, to be an untenable proposition.[84]

The Downstream Purchasers bought and sold oil and gas on credit with the Debtors agreeing to pay the following month.  Although the Downstream Purchasers did not pay for the oil on the sale date, they gave "new value" in the form of a promise to pay, increasing the Debtors' accounts receivable.  This increase in accounts receivable is considered "new value."  See In re Black Diamond Mining Co., 2011 WL 6202905, at *24 (holding that "new value" was created in the form of an increase in accounts receivable).

Additionally, payment in the form of oil is considered "new value."   The Debtors bought oil and gas in one location from the Downstream Purchasers and sold oil and gas to the Downstream

---

into in November 2007.   Thus, even with cross-product netting, the transactions entered into were still in the ordinary course of business for the Debtors.

[80] See, e.g., Beskrone Decl. Ex. B, Foxx Dep. 215:14-216:3, June 27, 2012 (testifying that netting is common in the industry, the most efficient way to settle on the 20th of the month, and that the Debtors would need a large credit facility to borrow money without netting).

[81] See, e.g., Beskrone Decl. Ex. B, Ronan Dep. 190:13-191:12, July 24, 2012 (testifying that without netting companies would have to take out large amounts of debt, which "doesn't make sense").

[82] See, e.g., Beskrone Decl. Ex. B, Navarro Dep. 25:14-20, June 28, 2012.

[83] Hr'g Tr. 63 [Docket No. 9400].

[84] See, e.g., Beskrone Decl. Ex. B, Ronan Dep. 192:5-10 (testifying that netting of physical crude purchases is "absolutely necessary" in this industry).

Purchasers in another location. These transactions allowed for the parties to cut down on transportation costs. Any difference in the amount of oil and gas sold and any price differences were accounted for at the end of the month via the netting agreements, and any debt owed was paid or satisfied in full. The record demonstrates that these transactions were bona-fide transactions where oil and gas was bought and sold and therefore, the Court finds that the transactions created "new value."

The Producers' third argument is that the cross-product netting agreements were made as security for a money debt. Because there was no antecedent debt at the time of the sale, this argument must also fail. It is well-established that BIOC is determined at the time of the sale and any subsequent action cannot affect a buyer's status as a BIOC. *See, e.g., In re Pearson Indus., Inc.,* 142 B.R. 831, 843 (Bankr. C.D. Ill. 1992) (holding that subsequent acts cannot be applied retroactively to the BIOC analysis). The law is equally clear that the "money debt" referenced in U.C.C. § 1-201(b)(9) must be an antecedent or pre-existing debt. *See In re Black Diamond Mining Co.,* 2011 WL 6202905, at *24 (stating that no pre-existing debt was due or owing by Black Diamond to Commodities at the time Commodities acquired the coal, and the transaction was thus not in total or partial satisfaction of a money debt); *In re Mid-Atl. Piping Prods. of Charlotte, Inc.,* 24 B.R. 314, 323 (Bankr. W.D.N.C. 1982) (stating that a person is not a BIOC "where a party receives goods in satisfaction of an *antecedent* money debt owed to that party") (emphasis added); *Ray v. City Bank & Trust Co. of Natchez, Miss.,* 358 F. Supp. 630, 639 (S.D. Ohio 1973) (holding that the plaintiff was not a BIOC because the "plaintiff's purchase...was in partial satisfaction of a *prior* personal debt") (emphasis added); *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.,* 01 CIV. 1047 (AJP), 2002 WL 31174470, at *18 (S.D.N.Y. Sept. 26, 2002) ("Courts have consistently held that purchases offset by *antecedent* debt do not provide 'new value,' and thus do not qualify as purchases in the ordinary course of business....") (emphasis added).

As a preliminary matter, the Court notes that cross-product netting did not occur at the time of the sale, and only occurred upon the Debtors' default, *i.e.,* their bankruptcy filing.[85] And subsequent events cannot affect the Downstream Purchasers' status as a BIOC.

---

[85] The EEI Agreement between BP and the Debtors set forth closeout netting of obligations upon an event of default. *See* Lullo Decl. Ex. C ¶ 3 [Adv. No. 09-50105, Docket No. 329]. Similarly, J. Aron's ISDA Master Agreement

The Producers argue that even if netting occurred afterward, the sale was as security for the Debtors' derivative trading exposure. But this allegation is not supported by the record because these transactions were bona-fide sales, *i.e.*, they were not sham transactions. The record reflects that J. Aron and BP had bought and sold oil and gas on credit with the Debtors with the expectation that they would pay the following month. Had the Debtors not defaulted on the agreements, J. Aron and BP would have had to pay for the oil in cash (or at least the difference after netting physical oil transactions). It appears equally true that had the derivatives market for oil stabilized, there may not have been financial liability to net against, and J. Aron and BP would have been expected, and legally obligated, to pay the Debtors in full. It was only upon the Debtors' default on their agreements, which occurred well after the sale, that the parties exercised their contractual rights to cross-product net.[86]

Further, if the Court focuses on the relevant June transactions,[87] it is clear that these transactions were in the ordinary course of business. The record reflects that no cross-product netting occurred in June.[88] These sales consisted solely of oil for oil sales, and buying on credit. As previously stated, buying on credit cannot be considered acquiring in satisfaction of a money debt. Buying and selling oil and gas on credit creates "new value" via cash payment, changes in accounts receivable, and monthly netting. Since no cross-product netting occurred for the outstanding unpaid product, it does not bear materially on the issue of these ordinary course transactions.

The Court finds that there is no genuine dispute of material fact that the Downstream Purchasers were buyers in the ordinary course, because the record developed herein demonstrates that they acted in

---

provided for cross-product netting upon default. *See* Zutshi Decl. Ex. E ¶¶ 6(a), (e) [Adv. No. 09-50038, Docket No. 664].

[86] Every month, the Downstream Purchasers netted physical oil against physical oil only. Thus, it cannot be said that the oil purchases were as security for an antecedent money debt because there was no guarantee that cross-product netting would ever occur.

[87] It is undisputed that the Producers have received payment for any outstanding liability owed to them for July's oil and gas sales. Therefore, the relevant period is June 2008 where they have not been paid for oil and gas sales.

[88] *See, e.g.*, Byroade Decl. in Support of BP Renewed Mot. Summ. J. Ex. B (evidencing BP's netting statement, which set forth netting of crude oil transactions with the Debtors for June 2008).

good faith, without knowledge of a violation of a security interest, provided new value, and did not acquire oil in satisfaction of an antecedent debt. Accordingly, the Court recommends that the Downstream Purchasers are entitled to summary judgment as buyers in the ordinary course.[89]

## C. Tort and Equitable Claims

The Producers have alleged a number of common law claims in addition to their statutory lien claims. Specifically, the Producers allege claims based in conversion, tortious interference, unjust enrichment, money-had-and-received, fraud, and accounting and disgorgement. The Court finds, and the Producers acknowledge,[90] that most of the tort and equitable claims are dependent on the lien analysis. See In re Black Diamond Mining Co., at *28 (holding that the secured party's contract and quasi-contract claims fail as a matter of law because they are subject to the buyer's U.C.C. defenses and its right to recoupment and setoff under the agreements between the buyer and the debtor). Because the Court finds that the Producers cannot prevail on their statutory lien claims, the Court will only address the tortious interference and fraud claims below. For these claims, the Court finds independent bases to recommend that summary judgment be granted in the Downstream Purchasers' favor.

The Producers' tortious interference claim must fail for lack of causation and intent. The elements of tortious interference with an existing contract are: (i) the existence of a contract, (ii) willful and intentional interference with the contract, (iii) proximate cause, and (iv) actual damages. See Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207

---

[89] Because the Court finds that the Downstream Purchasers were both BIOC and BFV, which defeats any claim the Producers may have had, the Court does not reach the merits on the Downstream Purchasers U.C.C. defenses under § 9-404 for recoupment and § 9-315 for waiver. The Court also does not reach the constitutional issues raised by the Downstream Purchasers in reference to the state lien laws. See McLaughlin v. Arco Polymers, Inc., 721 F.2d 426, 430 (3d Cir. 1983) ("We refrain from deciding constitutional issues when the case can be resolved on another basis."). Moreover, the Court need not reach the Orange Creek issue. Assuming Orange Creek could bring claims on behalf of CKC, the Downstream Purchasers' status as a BFV and BIOC precludes recovery by Orange Creek.

[90] See Hr'g Tr. 21 (Producers' counsel stating that only tortious interference and fraud are independent claims apart from the statutory lien analysis) [Docket No. 9401].

(Tex. 2002). To show proximate cause, the plaintiff must allege that the defendant took an active part in persuading a party to breach its contract. *See Hambric Sports Mgmt., LLC v. Team AK, Inc.*, No. 3:09-CV-1662-L, 2010 WL 2605243, at *9 (N.D. Tex. June 29, 2010). Additionally, a party can be justified in tortiously interfering with a contract if they are exercising their own legal rights or making a good-faith claim to a colorable legal right, even if that claim ultimately proves to be mistaken. *See Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 445 (Tex. App. 2008).

Here, the Producers have not sufficiently alleged willful and intentional conduct by the Downstream Purchasers in interfering with the contracts between the Producers and the Debtors.[91] The Producers argue that the Downstream Purchasers' efforts to maintain a net payable position are akin to willful and intentional interference with contract.[92] That allegation does not reach to the level of intentional and willful conduct. Even if it did, the Downstream Purchasers were justified in exercising their legal contractual rights in the netting agreements. Tellingly, the Producers are silent on the affirmative defense of justification.[93] Exercising legal rights is a complete defense to tortious interference with contracts and thus, the Producers cannot prevail on this claim. *See Fluor Enters., Inc.*, 273 S.W.3d at 445.

Next, the Producers' claim for fraud must also fail. A party commits fraud by

> (1) making a false, material misrepresentation (2) that the party either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it, and (5) is injured as a result.

*Rivers v. Charlie Thomas Ford, Ltd.*, 289 S.W.3d 353, 358 (Tex. App. 2009).

The Producers have not alleged that they ever came into contact with the Downstream Purchasers. This means it would be nearly impossible for the Downstream Purchasers to make a material misrepresentation to the Producers. In recognition of this predicament, the Producers argue that the misrepresentation may be acted as well as

---

[91] Moreover, as discussed above, the Producers fail to show direct evidence, and provide insufficient circumstantial evidence, of the Purchasers' actual knowledge of these contracts. *See supra* notes 56-59 and accompanying text.
[92] Producers Omnibus Resp. 60 [Adv. No. 09-50038, Docket No. 701].
[93] *See id.* at 58-61.

- 39 -

spoken, citing *Ten-Cate v. First Nat'l Bank*, 52 S.W.2d 323, 326 (Tex. Civ. App. 1932). However, the Downstream Purchasers' actions do not create a misrepresentation either. They entered into real contracts to buy and sell oil with the Debtors in good faith. Notwithstanding the Producers' bald assertions, nothing in the voluminous record supports a finding that the Downstream Purchasers and the Debtors had a plan to defraud the Producers. The Producers themselves cannot articulate this fraudulent scheme, and neither could any of the Debtors' employees.[94] Moreover, the Producers do not allege, and the record does not support, any bad faith by the Downstream Purchasers or the Debtors in entering into their agreements.[95] Therefore, the Court recommends that summary judgment be granted on all of the tort and equitable claims as well.

## D. Oklahoma Claims Under the PRSA

IC-CO raises tort claims under Oklahoma's PRSA. IC-CO alleges that these tort claims are a separate issue that was not litigated before. Further, IC-CO argues that none of the statutory defenses apply to these tort claims.

J. Aron argues that this claim is barred by collateral estoppel because it was already decided previously by this Court. Even if collateral estoppel does not preclude review, J. Aron argues that the statute has not been violated and it has no application past the first purchaser.

The Court finds that collateral estoppel does not apply to IC-CO's tort claims because the issues are sufficiently separate. *See Samson*

---

[94] *See, e.g.*, Beskrone Decl. Ex. B, Cooper Dep. 281:24-282:11, June 26, 2012 (testifying that he was unaware of any scheme to defraud the Producers)[Docket No. 9315]; Beskrone Decl. Ex. B, Foxx Dep. 233:8-234:2, June 27, 2012 (testifying that the Debtors intended to pay the Producers and he was unaware of any agreement to withhold payment or defraud the Producers); Beskrone Decl. Ex. B, Navarro Dep. 129:24-130:4, June 28, 2012 (testifying that he was unaware of an agreement not to pay the Producers); Lietzke Dep. 153:18-153:22, June 29, 2012 (same); Beskrone Decl. Ex. B, Allen Dep. 186:12-14, July 7, 2012 (same); Beskrone Decl. Ex. B, Ronan Dep. 239:2-5, July 24, 2012 (same).

[95] Review of the extensive submissions fails to reveal credible allegations of fraud and the Producers cannot make out the necessary elements for a fraud claim. Further, neither the Committee nor any of the Debtors' lenders filed any claim or cause of action sounding in actual fraud. This too is indicative of the scant evidence supporting this claim.

*Res. Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 140, 143 (Bankr. D. Del. 2009) (holding that the Oklahoma PRSA did not create a trust, but not evaluating possible tort claims). Nevertheless, IC-CO's tort claims must fail as a matter of law. The PRSA does not provide for tort claims. Regardless, the Court finds no violation of the statute. Further, the Producers cannot recover under the state lien laws because of the BFV and BIOC defenses. Because there is no violation of the PRSA and the Producers cannot otherwise recover, the Court recommends that there is no PRSA tort liability either.

## VI. CONCLUSION

For the foregoing reasons, the Court recommends that the Motions be granted, and that judgment be entered in favor of the Downstream Purchasers.

**BY THE COURT:**

Dated: June 28, 2013
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

- 41 -

Patrick J. Reilley, Esq.
Cole, Schotz, Meisel, Forman &
Leonard, P.A.
500 Delaware Avenue
Wilmington, DE 19801

-and-

Peter S. Goodman, Esq.
McKool Smith, P.C.
One Bryant Park,
47th Floor
New York, NY 10036

-and-

Lewis T. LeClair, Esq.
Basil A. Umari, Esq.
McKool Smith, P.C.
600 Travis Street, Suite 7000
Houston, TX 77002

*Counsel for the Associated
Producers*

Duane D. Werb, Esq.
Werb & Sullivan
300 Delaware Avenue, Suite
1300
Wilmington, DE 19801

-and-

Hartley B. Martyn, Esq.
Martyn & Associates
820 Superior Avenue N.W.,
10th Floor
Cleveland, OH 44113

*Counsel for IC-CO*

Don A. Beskrone, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue
Wilmington, DE 19899

-and-

Thomas J. Moloney, Esq.
Cleary Gottlieb Steen &
Hamilton LLP
One Liberty Plaza
New York, NY 10006

*Counsel for J. Aron & Company*

Raymond H. Lemisch, Esq.
Benesch, Friedlander, Coplan &
Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, DE 19801

-and-

Thomas B. Kinzler, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

*Counsel for BP Oil Supply
Company*

William D. Sullivan, Esq.
Sullivan Hazeltine Allinson LLC
901 N. Market Street, Suite 1300
Wilmington DE, 19801

    -and-

Alexander L. Kaplan, Esq.
Susman Godfrey LLP
1000 Louisiana, Suite 5100
Houston, TX 77002

*Counsel for Orange Creek Energy
LPV, LP*